IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-00245-MSK-MJW

REVEREND MATT HALE,

Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,
DAVID BERKEBILE (individually),
BLAKE DAVIS (individually),
CHRISTOPHER SYNSVALL (individually),
BENJAMIN BRIESCHKE (individually),
S. M. KUTA (individually),
L. MILUSNIC (individually),
PATRICIA RANGEL (individually),
WENDY HEIM (individually),
S. SMITH (individually),
H. REDDEN (individually),
DIANA KRIST (individually), and
A. TUTTOILMONDO (individually),

Defendants.

**REPORT & RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND FOR LACK OF SUBJECT MATTER JURISDICTION (Docket No. 41)**

**Michael J. Watanabe
United States Magistrate Judge**

Plaintiff Matt Hale is incarcerated at the maximum-security federal penitentiary in Florence, Colorado, because he was convicted of soliciting the murder of a federal judge. That judge had ruled against Plaintiff in civil litigation related to Plaintiff's purported religion: the Church of the Creator, a/k/a the Creativity Movement, for which the "overriding mission" "is the permanent prevention of the cultural, genetic, and biological genocide of the White Race worldwide and thus achievement of White racial

immortality." (Docket No. 10, pp.6–7.) "Creativity, like other religions, reaches the existence of a struggle between good and evil. Good is personified by the White Race and the crusade for its future while evil is personified by its antithesis in this world, the Jewish Race." (*Id.* p.21.)

He brings this case against the prison, alleging "continuous and ongoing violations of [his] First Amendment, Fifth Amendment, and Eighth Amendment rights as well as his rights under the Religious Freedom Restoration Act by virtue of the defendants taking away and interfering with his mail rights, forbidding his participation in his church, and denying him his religious diet." (*Id.* p.4.).

Defendants have moved to dismiss Plaintiff's case under Rule 12(b)(1), insofar as it seeks damages barred by sovereign immunity, and under Rule 12(b)(6), for all other purposes. (Docket No. 41.) Chief Judge Marcia S. Krieger referred the motion to the undersigned. (Docket No. 45.) The Court has reviewed the parties' filings (Docket Nos. 41, 49, 56, & 57), taken judicial notice of the court's entire file in this case, and considered the applicable Federal Rules of Civil Procedure, statutes, and case law. Now being fully informed, the Court recommends that Defendants' motion be granted and that Plaintiff's case be dismissed in full.

## BACKGROUND

### *The Church of the Creator*

Plaintiff is "ordained as a minister" in the Church of the Creator. (Docket No. 10, p.6.) Indeed, "[f]rom 1996 until the expiration of his term of office in 2006, [Plaintiff] was the leader of the Church or Pontifex Maximus ("greatest priest"). There has not been a Pontifex Maximus pursuant to Church guidelines since then." (*Id.* p.9.) This purported

3

religion was founded by Ben Klassen in 1973; adherents treat Klassen's books, including *Nature's Eternal Religion* and *The White Man's Bible*, as holy books. (*Id.* p.6.) In order to achieve its purpose of white racial immortality, adherents "advocate total racial separation so as to stop the mixture, and hence destruction, of White culture and genetic stock as well as murder at the hands of non-white attackers." (*Id.* p.7.) As alleged by Plaintiff, "[t]he means by which the Church seeks to accomplish its mission of racial salvation consists exclusively in the legal and peaceful proselytizing of Creativity to others. Creativity Scripture specifically forbids any and all illegal and violent acts by its adherents in its fight to attain the salvation of the White Race." (*Id.*)

"The meaning of life for those who embrace Creativity is the benefit of one's own kind and the purpose of life for every White man, woman, and child is to seek the preservation and betterment of their White Racial Family. Creativity thus includes the striving for a sound mind, in a sound body, in a sound society, in a sound environment." (*Id.* p. 8.) To that end, Plaintiff alleges, "[t]he Creativity religious diet consists of raw fruits, vegetables, nuts, and seeds only—in their uncooked natural state. Only by eating food in its natural state can Creators properly fulfill their allegiance to Nature's Laws . . . ." (*Id.* p.9.)

Proselytizing is an integral part of the belief system. (*Id.* p.7.) Thus, Plaintiff's "duties as an ordained minister include the espousal and promotion of Creativity to those with whom he corresponds and associates as well as to White people at large." (*Id.* p. 9.) "Creativity only seeks the conversion of one's own kind and shuns any proselytizing of the faith to other races." (*Id.* p.8.)

4

*Plaintiff's Mail Restrictions*

Defendants imposed a mail ban from July 2010 through January 2011, and again from January 2013 through July 2013. Plaintiff remains under a threat of further bans. (Docket No. 10, p.5.) As alleged by Plaintiff, the bans were imposed "because of [Defendants'] disdain for his religious beliefs and his desire to participate in his church." (*Id.*) Also as alleged by Plaintiff:

> In all of the years that Reverend Hale has been a federal prisoner, he has never been accused by prison staff of having committed a crime with his mail or having tried to do so. Nor has he ever been accused by prison staff of ever having fomented or encouraged violence in any way with his mail.
>
> Reverend Hale has never done anything with his mail since becoming a federal prisoner that would in any way justify or legitimize the taking away of his mail rights and nor has Reverend Hale ever been accused of having done so by prison staff.
>
> Reverend Hale's mail has thus always been legal, peaceful, and otherwise squarely within the law since he became a federal prisoner.
>
> In July 2010, defendants [] placed Reverend Hale on "Restricted General Correspondence" status (hereafter "mail ban") for, in part, having written an article for his Church in which Reverend Hale stated that he was reassuming his leadership as Pontifex Maximus, pro tempore ("for the time being"), until the next Pontifex Maximus could be elected by the Church membership pursuant to the guidelines set forth by Ben Klassen. The restriction banned all personal correspondence between Reverend Hale and anyone aside from his immediate family members and was imposed for an indefinite duration with review every six months.
>
> . . .
>
> Defendants Brieschke and Smith specifically told Reverend Hale that his mail was being taken away because Reverend Hale was trying to "direct" his Church.
>
> Defendant Davis specifically told Reverend Hale that "we don't want you to be Pontifex Maximus."

(*Id.* pp.11–12.)

The mail ban was lifted after roughly six months, but when Plaintiff asked for an explanation as to what would lead to future restrictions, he did not receive specific answers. (*Id.* pp. 13–14.) "Beginning in July 2012, [Plaintiff] began issuing written sermons to the Church on a monthly basis, each sermon being called a 'Sermon from Solitary.'" (*Id.*) "Among other things, the sermons urged Creators and others to stay within the law, refrain from any violence, and use persuasion to win over others to Creativity and to the cause of Racial Loyalty generally." (*Id.*) In January 2013, Plaintiff was again placed on Restricted General Correspondence. (*Id.* p.15.) As with the first restrictions, certain Defendants told Plaintiff that the purpose of the ban was to keep him from communicating with or leading his purported church. (*Id.*)

As further alleged by Plaintiff:

> The defendants, in imposing both mail bans, did not believe that his correspondence posed a threat of violence or any illegality in any way.
>
> Rather, the defendants took his mail rights away totally because of their disdain for his exercise of his First Amendment rights, because of their personal animosity for his Church and religion, and because they wanted to eliminate his First Amendment rights and hurt Reverend Hale personally because of the religion he adheres to and the opinions he holds otherwise.
>
> . . .
>
> The defendants, when they impose mail bans upon prisoners, routinely in fact claim that the prisoners' correspondence poses a "threat" regardless of whether this is sincerely believed or not. They do this as a means of discouraging prisoners from contesting the mail bans . . . . The defendants thus routinely hide behind what is facially a legitimate basis for the mail bans without necessarily believing in its legitimacy themselves and the claimed justification for the mail bans is actually meaningless since the claim of a "threat" is made regardless of whether there is any truth to the assertion as happened with Reverend Hale.

(*Id.* p.17.)

6

*Plaintiff's Other Restrictions*

The restrictions on Plaintiff's mail are the centerpiece of Plaintiff's complaint, but he also alleges other violations. He alleges that defendants "rejected and refused to allow Reverend Hale to have *Nature's Eternal Religion*, the main Bible of Reverend Hale's Creativity religious faith, when it arrived for him at Supermax." (*Id.* p.23.) Further, he alleges that Defendants have refused "to provide him with meals that meet his religious dietary needs." (*Id.* p.27.) In early 2013, the prison refused to allow a reporter from Fox News Chicago to conduct "an in-person on camera interview" with Plaintiff. (*Id.* pp.28–29.) As with the mail restrictions, Plaintiff alleges that these restrictions were motivated by animus against him and his beliefs rather than by any concerns for safety.

*Plaintiff's Legal Claims*

Plaintiff presses eleven legal claims:

- Count One alleges that the two mail bans, and the threat of further mail restrictions, violates Plaintiff's First Amendment rights;

- Count Two alleges that the two mail bans were impermissible retaliation for Plaintiff's exercise of his First Amendment rights;

- Count Three alleges that the two mail bans, and the threat of further mail restrictions, violate Plaintiff's rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1;

- Count Four alleges that the two mail bans violated Plaintiff's procedural due process rights because he was not given an evidentiary hearing before they were imposed;

- Count Five alleges that preventing Plaintiff from having a copy of *Nature's Eternal Religion* violates his First Amendment rights;

- Count Six alleges that Plaintiff is treated differently than the adherents of other religions—specifically, the Nation of Islam—on the basis of his race and his religion, in violation of his Equal Protection rights;

- Count Seven alleges that preventing Plaintiff from having a copy of *Nature's Eternal Religion* violates his rights under RFRA;

- Count Eight alleges that failing to provide a Plaintiff with diet of *only* raw fruits, vegetables, nuts, and seeds violates his First Amendment rights;

- Count Nine alleges that failing to provide a Plaintiff with diet of *only* raw fruits, vegetables, nuts, and seeds violates his rights under RFRA;

- Count Ten alleges that denying the in-person, on-camera interview with Fox News Chicago violated Plaintiff's First Amendment rights; and

- Count Eleven alleges that the mail bans and other restrictions, in the aggregate, combined with being housed at Forence ADX, combine to constitute cruel and unusual punishment in violation of Plaintiff's Eighth Amendment rights.

For relief, Plaintiff requests (1) a declaratory judgment that 28 C.F.R. § 540.15 (which allows for mail restrictions) is unconstitutional on its face; (2) injunctive relief against the U.S. Bureau of Prisons and all individual Defendants; and (3) money damages from each person named as a Defendant.

## **DISCUSSION**

I. **Motions to Dismiss**

As recently stated by Chief Judge Krieger:

[W]hen reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party.  The Court must limit its consideration to the four corners of the Amended Complaint, any documents attached thereto, and any external documents that are referenced in the Amended Complaint and whose accuracy is not in dispute.  A claim is subject to dismissal if it fails to state a claim for relief that is plausible on its face.  To make such an assessment, the Court first discards those averments in the Complaint that are merely legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.  The Court takes the

> remaining, well-pled factual contentions, treats them as true, and ascertains whether those facts (coupled, of course, with the law establishing the requisite elements of the claim) support a claim that is "plausible" or whether the claim being asserted is merely "conceivable" or "possible" under the facts alleged. What is required to reach the level of "plausibility" varies from context to context, but generally, allegations that are so general that they encompass a wide swath of conduct, much of it innocent, will not be sufficient.

*Ybanez v. Scott*, No. 14-cv-01059-MSK-MJW, 2015 WL 1258290, at *3 (D. Colo. Mar. 17, 2015) (internal citations and most quotation marks omitted).

## II.   Declaratory Judgment

Defendants' motion to dismiss should be granted as to Plaintiff's request that 28 C.F.R. § 540.15 be declared facially unconstitutional, because wardens are allowed to regulate mail in pursuit of legitimate penological interests. *Thornburgh v. Abbott*, 490 U.S. 401, 415–19 (1989) (finding that policy allowing prison officials to reject incoming mail deemed detrimental to security does not violate First Amendment); *Akers v. Watts*, 740 F. Supp. 2d 83 (D. D.C. 2010) (rejecting as-applied constitutional challenges to 28 C.F.R. § 540.15). The Court therefore recommends that, as to Plaintiff's request for declaratory relief, Defendants' motion be granted under Fed.R.Civ.P. 12(b)(6).

## III.  Money Damages

Defendants' motion to dismiss should also be granted as to Plaintiff's request for money damages, because only two of his legal claims supports such relief and Defendants are entitled to qualified immunity on those particular claims.

### Plaintiff's RFRA Claims

Counts Three, Seven, and Nine are based on RFRA. RFRA authorizes "appropriate relief," but in so doing Congress did not waive sovereign immunity for

money damages. *Webman v. Fed. Bureau of Prisons*, 441 F.3d 1022, 1025–26 (D.C. Cir. 2006). In fact, Plaintiff concedes that monetary relief is not available for his RFRA claims. (Docket No. 49, pp.20, 115.)

<u>Plaintiff's First Amendment & Procedural Due Process Claims</u>

Counts One, Two, Five, Eight, and Ten are claims brought under the First Amendment for violations of Plaintiff's freedom of speech and freedom of religion. Count Four is a procedural due process claim. All of these claims are brought as *Bivens* actions—but there is no *Bivens* remedy available for such claims where, as here, injunctive relief is available. *See, e.g., Williams v. Klien*, 20 F. Supp. 3d 1171, 1174 – 75 (D. Colo. 2014) (no *Bivens* remedy for First Amendment retaliation claim alleging prison guard used racial intimidation and prison restrictions to prevent plaintiff from filing further administrative grievances); *Shepard v. Rangel*, No. 12-cv-01108-RM-KLM, 2014 WL 7366662, at *15 (D. Colo. Dec. 24, 2014) (no *Bivens* remedy for First Amendment retaliation claim alleging prison guard ransacked plaintiff's cell because he asked to use the prison law library); *Horton v. Davis*, No. 13-cv-01089-REB-BNB, 2014 WL 2593075, at *4 (D. Colo. June 10, 2014) (no *Bivens* remedy for First Amendment or procedural due process claims); *Davis v. Holder*, No. 12-CV-02122-REB-KMT, 2014 WL 1713429, at *9 (D. Colo. Apr. 23, 2014) (no *Bivens* remedy for First Amendment or procedural due process claims); *Allmon v. Lappin*, No. 11-cv-00549-MSK-CBS, 2013 WL 1149507, at *4 (D. Colo. Mar. 19, 2013) (no *Bivens* remedy for First Amendment or procedural due process claims regarding restrictions on prison mail).

To argue to the contrary, Plaintiff relies heavily on *National Commodity & Barter Association v. Archer*, 31 F.3d 1521 (10th Cir. 1994), in which the Tenth Circuit allowed

10

a *Bivens* action to proceed on some, but not all, of the plaintiffs' claimed First Amendment violations. But the case does not help Plaintiff because it does not stand, as Plaintiff would have it, as a broad holding that *Bivens* relief is always available for all claims under the First Amendment. Rather, in *Archer*, the *Bivens* remedy was allowed only where other relief was not available as a practical matter; for plaintiffs' First Amendment theories where other relief *was* available, the *Bivens* claims did *not* go forward. *Compare id.* at 1257, *with id.* at 1232. Likewise, here, where Plaintiff has relief available to him other than a *Bivens* remedy, *Bivens* is unavailable.

### Plaintiff's Eighth Amendment & Equal Protection Claims

The Supreme Court has, by contrast, recognized a *Bivens* remedy for violations of the Eighth Amendment's Cruel and Unusual Punishment Clause, *Carlson v. Green,* 446 U.S. 14 (1980), and violations of the Fifth Amendment's Equal Protection component, *Davis v. Passman,* 442 U.S. 228 (1979). *See Correctional Services Corp. v. Malesko,* 534 U.S. 61, 67 (2001). Plaintiff's Count Eleven is a cruel-and-unusual claim, and his Count Six is an equal-protection claim. Thus, the *Bivens* remedy is at least theoretically available to Plaintiff.

But on these claims, Plaintiff's Complaint cannot overcome qualified immunity. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes

11

would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

Plaintiff here alleges that Defendants knowingly—indeed, intentionally and maliciously—violated his rights because of animus against his religious beliefs, but even at the Rule 12(b)(6) stage the Court does not accept such conclusory allegations. Looking through Plaintiff's rhetoric and accusations, his well-pleaded facts allege that (1) he is the leader of a white-supremacist group devoted to white racial immortality; and (2) the measures he complains of have been taken in response to the racist tenor of his activities. It is true, as Plaintiff alleges, that his general right to have access to mail, holy books, and a religious diet is clearly established. But the Supreme Court "'ha[s] repeatedly told courts . . . not to define clearly established law at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. *Plumhoff*, 134 S. Ct. at 2023 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. at 2074). The question thus isn't whether Plaintiff has a right to send mail—it's whether he has the right to send mail conducting the business of his white-supremacist movement. The question isn't whether he has a right to access books he considers holy—it's whether he has a right to bring into the prison books he considers holy that also "advocate total racial separation so as to stop the mixture, and hence destruction, of White culture and genetic stock." And given the numerous cases granting prison wardens leeway to restrict the activities of racist hate groups, *see, e.g.*, *Ind v. Wright*, 52 F. App'x 434, 438 (10th Cir. 2002); *Rooks v. Zavares*, No. CIV.A. 99-B-631, 2001 WL 34047959, at *12 (D. Colo. Jan. 25, 2001); *George v. Sullivan*, 896 F. Supp. 895, 898 (W.D. Wis. 1995); *Murphy v. Missouri Dep't*

*of Corr.*, 814 F.2d 1252, 1256 (8th Cir. 1987), it cannot be said that the conduct Plaintiff complains of was clearly unconstitutional to every reasonable prison official.

The Court therefore recommends that, as to Plaintiff's request for monetary relief, Defendants' motion be granted under Fed.R.Civ.P. 12(b)(1) and 12(b)(6).

**IV.    Injunctive Relief**

Finally, Plaintiff requests injunctive relief. Defendants argue, as to each of Plaintiff's legal claims, that he fails to state a claim under Rule 12(b)(6).

Counts One, Two, Three, Four, and Ten

Before reaching the Rule 12(b)(6) question, the Court has an obligation to assure itself (*sua sponte*, if need be) of its own jurisdiction—including justiciability. *Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004). In the context of a claim for injunctive relief, past illegal conduct does not create a live case or controversy sufficient to confer subject-matter jurisdiction upon federal courts. *Citizen Center v. Gessler*, 770 F.3d 900, 906–07 (10th Cir. 2014). Here, Plaintiff's claims based upon the mail restrictions are moot because, according to the complaint, the mail restrictions are not currently in place. Further, Plaintiff has not alleged that the Fox News Chicago reporter in Count Ten still seeks an in-person, on-camera interview. Thus, regardless of whether they state a claim, Counts One, Two, Three, Four, and Ten are nonjusticiable and must be dismissed under Rule 12(b)(1).

Counts Five & Seven

Counts Five and Seven allege that Plaintiff has a right (under either the First Amendment or RFRA) to have access to a copy of *Nature's Eternal Religion*, which he considers a holy book. Every other Federal court to address the question has rejected

13

Plaintiff's argument, applying the required analysis from *Turner v. Safley*, 482 U.S. 78 (1987). *See, e.g.*, *Birkes v. Mills*, 2011 WL 5117859, at *4–7 (D. Ore. Sept. 28, 2011) (on summary judgment, *White Man's Bible* properly prohibited as dangerous and inflammatory, regardless of whether Church of Creativity qualified as religion under First Amendment or RLUIPA); *Byrnes v. Biser*, 2007 WL 3120296 (W.D. Pa. Oct. 23, 2007) (on motion to dismiss, *Nature's Eternal Religion* properly prohibited as dangerous and inflammatory); *Sides v. Religious Accommodation Comm.*, 2007 WL 2908223, at *3 (M.D. Pa. Oct. 1, 2007) (on motion for preliminary injunction, *White Man's Bible* properly prohibited as dangerous and inflammatory); *Seace v. N. H. Dep't of Corr.*, 2001 WL 1297130, at *4–5 (D. N.H. Oct. 22, 2001) (on motion for summary judgment, *White Man's Bible* properly prohibited as dangerous and inflammatory). As with these other courts, this Court concludes that, as a matter of law, a prohibition on Plaintiff's possession of *Nature's Eternal Religion*—as it is described in Plaintiff's complaint (Docket No. 10, pp.6–8)—easily passes muster under the *Turner* test.

      Plaintiff's only real effort to distinguish these cases is to argue that, as alleged in his Complaint, his religion and its texts advocate for nonviolence. This makes no difference. The material, as he describes it, is nonetheless inflammatory and dangerous—and under *Turner* prison wardens have the discretion to impose reasonable restrictions on it. Plaintiff's other arguments fail for similar reasons. He alleges that he is kept in something akin to solitary confinement and therefore has no means to disseminate the book; but even drawing inferences in Plaintiff's favor and assuming there would indeed be only a slight risk that the book moves about in

14

Supermax, Defendants are nonetheless not compelled by the First Amendment or RFRA to run that risk.

### Counts Eight & Nine

Counts Eight and Nine allege that Plaintiff has a right (under either the First Amendment or RFRA) to have the prison provide him with a diet of *only* raw vegetation—uncooked fruits, vegetables, nuts, and seeds. As with Plaintiff's holy-book claim, every court to consider this claim has rejected it. *See, e.g.*, *Conner v. Tilton*, 2009 WL 4642392, at *6–14 (N.D. Cal. Dec. 2, 2009) (on summary judgment, religious diet not required because Creativity Movement did not qualify as a religion within the meaning of the First Amendment or the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc *et seq.*); *Oakden v. Bliesner*, 2007 WL 2778788, at *1 (N.D. Cal. Sept. 21, 2007) (same); *Stanko v. Patton*, 568 F. Supp. 2d 1061, 1071 (D. Neb. 2008) *aff'd*, 357 F. App'x 738 (8th Cir. 2009) (same). Plaintiff argues, in essence, that these courts came to the wrong conclusion—and, as the exalted leader of his church, Plaintiff should be given a chance to present a better, more thorough case as to why the Church of the Creator is a "religion" for purposes of the First Amendment and RFRA.

The Tenth Circuit set forth a comprehensive test for determining "religious beliefs" under RFRA, in *United States v. Meyers*, 95 F.3d 1475, 1482–84 (10th Cir. 1996). However, even courts applying the *Meyers* test reject the idea that Plaintiff's Church of the Creator qualifies as a religion. *See, e.g.*, *United States v. Trainer*, 265 F. Supp. 2d 589 (E.D. Va. 2003). The Court agrees with the analysis of *Connor*, *Oakden*, *Stanko*, and *Trainer*. As described in Plaintiff's complaint, the Church of the Creator

constitutes a wholly ideological and secular belief system rather than a "religion." Defendants are thus under no legal obligation to accommodate Plaintiff's preferred diet.

### Count Six

Count Six alleges that Plaintiff has been treated differently on the basis of his religious beliefs. As with Plaintiff's religious-accommodation claims, courts routinely find that the Creativity Movement is not a religion and, therefore, not a suspect classification. *See, e.g.*, *Todd v. Cal. Dep't of Corrs.*, 2013 WL 1281611, at *6 (E.D. Cal. Mar. 26, 2013); *Birkes*, 2011 WL 5117859, at *7–8; *Prentice v. Nev. Dep't. of Corr.*, 2010 WL 4181456, at *6 (D. Nev. Oct. 19, 2010). Plaintiff has provided no allegations that would suggest his iteration of this belief system is any different than that of the plaintiffs in these other cases; as a result, as a matter of law, his belief system is not a religion for purposes of the Equal Protection Clause.

Without alleging a suspect classification, Plaintiff's equal protection claim is reviewed for any rational basis—specifically, whether there is any rational relationship to a legitimate penological purpose. *Shakur v. Shriro*, 514 F.3d 878, 891 (9th Cir.2008) (applying *Turner* analysis to classification for purposes of equal-protection claim). Obviously, prisons have a rational basis for restricting the activities of racist hate groups within their walls, and thus it survives rational-basis review for prisons to treat such groups differently than conventional religions. Plaintiff argues, though, that the Nation of Islam is also a separatist racial hate group, and that his separatist racial hate group is treated different than theirs. Plaintiff's allegations on this matter lack any specificity— failing to allege any actual facts from which the Court could infer that the Nation of Islam

content made available in the prison is hateful, racist, or separatist.  Accordingly, these allegations do not help Plaintiff state a claim.

Count Eleven

Finally, Count Eleven claims that (in the aggregate) Plaintiff's placement at Supermax, combined with the restrictions on his Creativity-related activities, constitutes cruel and unusual punishment.  As the Supreme Court has explained:

> . . . Today the Eighth Amendment prohibits punishments which, although not physically barbarous, involve the unnecessary and wanton infliction of pain, or are grossly disproportionate to the severity of the crime.  Among unnecessary and wanton inflictions of pain are those that are totally without penological justification.
>
> No static "test" can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society. . . .
>
> These principles apply when the conditions of confinement compose the punishment at issue.  Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment. In *Estelle v. Gamble*, we held that the denial of medical care is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose.  In *Hutto v. Finney*, the conditions of confinement in two Arkansas prisons constituted cruel and unusual punishment because they resulted in unquestioned and serious deprivation of basic human needs.  Conditions other than those in *Gamble* and *Hutto*, alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities.  Such conditions could be cruel and unusual under the contemporary standard of decency that we recognized in *Gamble*.  But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional.  To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

*Rhodes v. Chapman*, 452 U.S. 337, 346–47 (1981) (internal citations and quotation marks omitted).  Nothing Plaintiff has alleged rises to this standard.

Conclusion

For the foregoing reasons, as to Plaintiff's claims for injunctive relief, the Court concludes that Counts One, Two, Three, Four, and Ten should be dismissed as nonjusticiable under Rule 12(b)(1), and that Counts Five, Six, Seven, Eight, Nine, and Eleven should be dismissed for failure to state a claim under Rule 12(b)(6).

**Recommendation**

For the foregoing reasons, the undersigned RECOMMENDS that Defendants' Motion to Dismiss (Docket No. 41) be GRANTED and that Plaintiffs' Amended Prisoner Complaint (Docket No. 10) be DISMISSED in full. More specifically:

- To the extent the Amended Prisoner Complaint seeks declaratory judgment, that it be dismissed under Rule 12(b)(6);

- To the extent the Amended Prisoner Complaint seeks money damages, that it be dismissed under Rule 12(b)(1) (as to all counts except Counts Six and Eleven) and under Rule 12(b)(6) (as to Counts Six and Eleven); and

- To the extent the Amended Prisoner Complaint seeks injunctive relief, that it be dismissed under Rule 12(b)(1) (as to Counts One, Two, Three, Four, and Ten) and under Rule 12(b)(6) (as to Counts Five, Six, Seven, Eight, Nine, and Eleven).

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District**

18

**Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge, Thomas v. Arn, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions, Makin v. Colo. Dep't of Corr., 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996)**.

Dated: April 16, 2015          */s/ Michael J. Watanabe*
Denver, Colorado               Michael J. Watanabe
                               United States Magistrate Judge