**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 14-CV-0245-MSK-MJW

**REVEREND MATT HALE,**

     **Plaintiff,**

*v.*

**FEDERAL BUREAU OF PRISONS,**

     **Defendant.**

---

## OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

---

     **THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment (**# 186**), the Plaintiff's Response (**# 193**), and the Defendant's Reply (**# 199**); the Plaintiff's Motion to Strike and Response to So-Called "Fact Exhibit" (**# 202**), the Defendant's response (**# 203**), and the Plaintiff's reply (**# 205**); the Plaintiff's Motion to Allow Declarations by Nonparties (**# 206**) and the Defendant's response (**# 207**); and the Defendant's Motion to Strike Exhibits (**# 210**) and the Plaintiff's response (**# 211**).   For the following reasons, the motion for summary judgment is granted and the remaining motions are denied as moot.

### I.    JURISDICTION

     The Court exercises jurisdiction under 28 U.S.C. § 1331.

### II.    BACKGROUND[1]

The Court summarizes the pertinent facts here and elaborates as necessary in its analysis.

---

[1]   The Court recounts the facts in the light most favorable to Mr. Hale, the nonmoving party.   *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).   In large part, the parties do not dispute the material facts.

## I.    Mr. Hale and his beliefs

Plaintiff Matt Hale, proceeding *pro se*,[2] is an inmate in the custody of Defendant Federal Bureau of Prisons (BOP) and housed at the Administrative Maximum facility in Florence, Colorado (ADX).   He is a member, practitioner, and former leader of the Church of the Creator (also referred to as "Creativity").   Members of the Church of the Creator consider Creativity to be a religion.   It is undisputed that a central tenet of Creativity is the premise of the superiority of the white race and the need for racial purity and segregation.

For the sake of convenience, the Court will not reproduce the parties' recitation of Creativity's religious texts.   Suffice it to say that a survey of the roughly 41 principles of Creativity set forth by the parties — 5 fundamental beliefs, 16 commandments, and 20 points of creed — reveals that nearly all of those principles comprise exhortations or instructions to adherents to accomplish the singular goal of promoting the purity of the white race and advocating for the geographic, political, and social segregation (if not the outright destruction) of other races. The most prominent secondary points found in those principles are instructions to preserve the environment of the Earth, to restore soil fertility and improve farming yields, and to promote a natural lifestyle so as to advance the physical and mental health of adherents.

## II.    BOP actions giving rise to this suit

From July 2010 to January 2011 and again from January to August 2013, the BOP imposed

---

[2]   The Court understands that Mr. Hale is a law school graduate, although he is not licensed by the bar of any state.   Where licensed attorneys appear as pro se litigants, they are not entitled to liberal construction of the pleadings under *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972).   *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001).   Licensure — *e.g*., good standing — is not the key feature, as the Tenth Circuit has also stated that "trained" attorneys appearing *pro se* do not enjoy liberal construction either.   *Porta v. OPM*, 580 F. App'x 636, 640 n.2 (10th Cir. 2014).   In any event, whether Mr. Hale is afforded liberal construction of his pleadings or not does not meaningfully alter the analysis herein.

a mail restriction on Mr. Hale's incoming and outgoing correspondence. The restriction was imposed in response to Mr. Hale's efforts to direct affairs within the Church of the Creator. For the same reasons, the BOP denied Mr. Hale a copy of a book entitled *Nature's Eternal Religion* (a Creativity religious text), the diet outlined in *Salubrious Living* (another Creativity religious text), and the ability to conduct an on-camera interview with a Chicago television station.

### III.     Mr. Hale's claims

Mr. Hale brought this suit alleging that the mail restriction and various other prison restrictions violated his constitutional rights. Currently pending are six claims, which the Court groups by subject matter. The first three claims focus on the mail restrictions, alleging that the restrictions (1) violated Mr. Hale's constitutional right to free exercise of religion under the First Amendment, (2) violated his rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*; and (3) were imposed as retaliation against him because of his exercise of his First Amendment rights. The second set of claims relate to Mr. Hale's claims that he was denied access to a diet consistent with the principles of Creativity, and that the denial (4) deprived him of his free-exercise rights under the First Amendment, and (5) violated RFRA. Finally, the final claim is that (6) Mr. Hale was denied the opportunity to possess a copy of *Nature's Eternal Religion*, in violation of his right to free speech under the First Amendment.

### IV.     The BOP's Motion

The BOP moves for summary judgment on all claims (**# 186**). In the course of briefing, the BOP attached an exhibit to its reply that organized its evidence and Mr. Hale's response thereto. Mr. Hale moves to strike this "fact exhibit" (**# 202**). Mr. Hale has also asked to submit declarations from nonparties in support of his summary-judgment response (**# 206**). The BOP moves to strike a notice filed by Mr. Hale (**# 210**).

3

### III.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.    *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).    Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.    Fed. R. Civ. P. 56(a).    Substantive law governs what facts are material and what issues must be determined.    It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof.    *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).    A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.    *See Anderson*, 477 U.S. at 248.    When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.    *See* Fed. R. Civ. P. 56(c)(1)(A).    Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.    *See Bacchus Indus. Inc. v. Arvin Indus. Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).    If there is a genuine dispute as to a material fact, a trial is required.    If there is no genuine dispute as to any material fact, no trial is required.    The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of

sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## IV. DISCUSSION

### A. Mail Restriction Claims

Mr. Hale alleges that the mail restrictions violated his free-exercise rights, RFRA, and were retaliatory to his exercise of First Amendment rights. The BOP contends that CREATIVITY is not a religion for purposes of the Free Exercise Clause or the Religious Freedom Restoration Act, which would proscribe Claims 1, 3, 5, and 6. Second, it contends that even if it was, and Mr. Hale's religious practices were burdened by the mail and other restrictions, such restrictions were nevertheless permissible because they were supported by a compelling justification.

#### 1. Standing

The BOP first challenges Mr. Hale's standing to attack the mail restrictions, arguing that Mr. Hale is only capable of seeking injunctive relief against the BOP, and that the 2010 and 2013 mail restrictions are no longer in effect. The Court addressed a similar argument in its September 30, 2015, Opinion and Order (**# 66**), finding that although Mr. Hale was not the subject of a *current* mail restriction, the restrictions that he challenged were "capable of repetition, yet evading review." *Id.* at n.1.

In the instant motion, the BOP argues that although Mr. Hale is once again under restrictions on his correspondence with others, those restrictions are qualitatively different from

the restrictions he was under in 2010 and 2013. As the Court understands it, the 2010 and 2013 restrictions prohibited Mr. Hale from corresponding with persons beyond his immediate family on any topic whatsoever. Now, he is permitted to correspond with persons outside his immediate family, but is still prohibited from having any such communications that touch on matters relating to Creativity. Thus, the BOP contends the "Court does not have subject-matter jurisdiction to award prospective injunctive relief because the current manner in which Mr. Hale's communications are monitored bears no relation to those past restrictions."

The Court finds that its observations in the September 30, 2015, Opinion and Order on the question of standing remain valid. It is undisputed that, presently, Mr. Hale remains restricted in his ability to correspond with anyone *about Creativity*. Although other aspects of the 2010 and 2013 mail restrictions are not present in the current restrictions on Mr. Hale, the aspects of the 2010 and 2013 restrictions that animate his Free Exercise and RFRA claims — the inability to correspond with others *about his purported religious beliefs* — remain. More importantly, assuming Mr. Hale could otherwise establish his free-exercise or RFRA claims, he could conceivably be entitled to injunctive relief that would effectively modify the continuing restrictions on his ability to correspond about Creativity. In such circumstances, the Court is satisfied that Mr. Hale has standing to bring the current constitutional and RFRA claims.

### 2. *The Free Exercise Clause and RFRA*

The Free Exercise Clause prevents the government from making any law prohibiting the free exercise of religion, which can manifest itself in either the freedom to believe or the freedom to act. *See* U.S. Const. amend I; *United States v. Meyers*, 95 F.3d 1475, 1480 (10th Cir. 1996) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940)). Where the freedom to believe is absolute, the freedom to act may be regulated for the protection of society. *Cantwell*, 310 U.S. at

303–04.   If a law is neutral and generally applicable, it does not violate the Free Exercise Clause "even if the law has the incidental effect of burdening a particular religious practice."   *Church of the Lukumi Babalu Aye Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).   Going further, RFRA generally prohibits the government from burdening a person's exercise of religion, even by operation of a law of general applicability.   42 U.S.C. § 2000bb-1(a).

Though they vary slightly, both the constitutional and RFRA standards protect only belief systems that may properly be considered religious.   *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 713–14 (1981); *Thiry v. Carlson*, 78 F.3d 1491, 1494 (10th Cir. 1996).   To establish his free-exercise claim, Mr. Hale must show that (1) he has a sincerely-held belief that is religious in nature; (2) that the mail restrictions substantially burdened that belief; and (3) that the BOP lacked a legitimate penological interest that justified the restrictions, considering the factors set forth in *Turner v. Safley*, 482 U.S. 78 (1987).   *Kay v. Bemis*, 500 F.3d 1214, 1218–19 (10th Cir. 2007).   And to establish his RFRA claim, Mr. Hale must demonstrate he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which (3) is subject to a substantial burden imposed by the government.   *See Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001). Thus, the question of whether CREATIVITY may be considered a "religion" affects the analysis of both Mr. Hale's free-exercise and RFRA claims (Claims 1, 3, 5, and 6).

Although they appear similar, Mr. Hale's free-exercise and RFRA claims differ slightly, particularly as they relate to the nature of the governmental interest in question.   Under the Free Exercise Clause, the government's interest need only be "reasonably related to legitimate penological interests," and the Court applies the deferential *Turner* standard in assessing that penological interest, generally.   Under RFRA, however, the Court must consider the particular application of the governmental action on the inmate in question and determine whether there is a

compelling justification for applying *that* policy to *that* inmate. *Id.* Moreover, under RFRA, the government bears the burden of proof that its interests are compelling and narrowly-tailored. *Ghalani v. Sessions*, 859 F.3d 1295, 1305 (10th Cir. 2017). Thus, the RFRA claim places a more substantial burden on the government than does the free-exercise claim.

Here, the BOP moves for summary judgment on both claims, arguing that: (1) the principles of Creativity are not "religious" in nature; and (2) to the extent they are, the BOP is nevertheless entitled to summary judgment on the RFRA claim[3] because it has a compelling interest in preventing Mr. Hale from corresponding about Creativity and the restrictions on Mr. Hale are narrowly-drawn to effectuate that interest.

### 2. *Whether Creativity is a Religion*[4]

In this Circuit, to determine if a belief system is truly "religious", the Court considers whether it: (1) addresses ultimate ideas, (2) contains metaphysical beliefs, (3) prescribes a particular moral or ethical system, (4) involves comprehensive beliefs, and (5) is accompanied by accoutrements of religion. *Meyers*, 95 F.3d at 1483. No one factor is dispositive, but "purely personal, political, ideological, or secular beliefs" will not likely suffice. *Id.* at 1484 (citing *Yoder*, 406 U.S. at 216). Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection. *United States v. Seeger*,

---

[3] And, by extension, the free-exercise claim, as that claim is even more deferential to the BOP.

[4] The Court notes that several district courts have entertained this question and have uniformly found that, at least for free-exercise and RFRA purposes, Creativity is not a religion. *See, e.g.*, *Stanko v. Patton*, 568 F. Supp. 2d 1061, 1072 (D. Neb. 2008); *Conner v. Tilton*, 2009 WL 4642392 at *9–12 (N.D. Cal. Dec. 2, 2009); *Prentice v. Nev. Dep't of Corr.*, 2010 WL 4181456 at *4 (D. Nev. Oct. 19, 2010); *Birkes v. Mills*, No. 3:10-CV-0032, 2011 WL 5117859 at *4 (D. Ore. Sept. 28, 2011). The sole decision finding that Creativity *could* constitute a religion arose in the employment-discrimination context, where the inquiry focuses on how the beliefs affect the adherent, not on the religious character of the beliefs themselves. *Peterson v. Wilmur Commc'ns Inc.*, 205 F. Supp. 2d 1014, 1018 (E.D. Wis. 2002).

380 U.S. 163, 184–85 (1965). Indeed, the concept of white supremacy, though secular in the sense that it is a racist idea, could be religious in context. *Wiggins v. Sargent*, 753 F.2d 663, 667 (8th Cir. 1985).

Examples of how the *Meyers* criteria are applied to particular factual scenarios are instructive with regard to application to the facts of this case. As noted below, when the *Meyers* factors are applied, unusual belief systems are not found to be religions for one of two reasons - either belief system is so vague and indeterminate that it fails to prescribe any moral or ethical system (*Africa*, *Jacques*) or the beliefs are so narrowly focused that they do not address metaphysical or ultimate issues or otherwise comprise a comprehensive set of beliefs. (*Meyers*, *Quaintance*, *Versatile*). In both circumstances, the belief system is found to be a secular rather than religious one.

In *Meyers,* the defendant was charged with cannabis possession. As a defense, he testified that he was the founder and reverend of the "Church of Marijuana", wherein he was religiously commanded to use, possess, grow, and distribute cannabis "for the good of mankind and the planet earth." 95 F.3d at 1479. Although the court noted that whether a belief structure is established or recognized cannot be the sole determinant of whether it qualifies as a religion, the secular nature of Meyers' beliefs more accurately espoused a philosophy or way of life rather than a religion. *Id*. at 1484.

In *Africa v. Pennsylvania*, upon which *Meyers* was partially based, the defendant was a prisoner who requested a special, raw-food diet as adherent to MOVE, an organization "opposed to all that is wrong." 662 F.2d 1025, 1026 (3d Cir. 1981). MOVE's goals were to bring about peace, stop violence, and end corruption. *Id*. MOVE adherents believed in using things but not misusing them. *Id*. Avoiding ceremonies and rituals, every act of life was invested with

religious significance to MOVE adherents. For MOVE adherents, "every day of the year can be considered a religious 'holiday'" because no single day is more special than another. *Id*. Noting that MOVE did not address any fundamental, ultimate, or overarching principles, the court held that MOVE was concerned with secular matters and lacked a comprehensive, multi-faceted theology. *Id*. at 1033–36.

In *Jacques v. Hilton*, the plaintiffs were founders of the United Church of Saint Dennis, ULC Inc., which was loosely affiliated with the Universal Life Church. 569 F. Supp. 730, 731 (D.N.J. 1983). Saint Dennis was not a reference to any particular individual. The church recognized the "Spirit of Life" as a supernatural force, which each individual possessed. A central tenet of the church was each individual's right to honor any supreme being in any manner he chose, and to act consistently with his own beliefs. Church adherents celebrated June 21 as the day life began. There we no rituals at meetings, rather they were opportunities for participants to assist each other in reconciling any conflict that they were experiencing. Applying *Africa*, the court determined the church was not a religion because its exhortation to be guided by conscience was entirely a matter of self-determination. Additionally, the court noted that when each individual is the arbiter of his own truth, there can be no common beliefs to unite different adherents.

In *United States v. Quaintance*, one of the defendants was the founder of the Church of Cognizance, which maintained that cannabis was a sacrament and deity, and that its consumption was worship. 471 F. Supp. 2d 1153, 1155 (D.N.M. 2006). The defendant testified that the church adherents sought to live the longest, healthiest life possible, for which the path was narrow. *Id*. at 1157. Applying *Meyers*, the court found that the church addressed only one ultimate idea — longevity — which was insufficiently profound or comprehensive. Though the court found the

evidence for metaphysical beliefs to be ambiguous, the defendants presented no evidence that "good thoughts, good words, good deeds" was anything more than a secular ethical system.

In *Versatile v. Johnson*, the plaintiff, who was a prisoner and adherent of Nation of Gods and Earths (NGE), sought to reverse the prison's ban on certain texts. No. 3:09-CV-0120, 2011 WL 5119259 at *1 (E.D. Va. Oct. 27, 2011). NGE adherents believe that their god, Allah, stands for "Arm Leg Leg Arm Head", and refers to "to black men and their physical form." Adherents refer to their teachings as Islam, but recognize the term to mean "I Self Lord And Master". The central goal of NGE is to gain knowledge of one's self and become a lord and master of one's own judgments. NGE teaches that the white man is the devil and that whites are physically and mentally inferior to blacks. Though white people can join NGE, they can never become "Gods" in the sense that black men can. The court also found that, despite using words that connoted metaphysicality, NGE was focused inward on a god that did not exist outside of adherents themselves. The court further found that, aside from the basic tenets of family and black unity, NGE had no moral component, as adherents were "free to decide their own code of personal morality". Though the court found that NGE had important texts, maintained gathering places, recognized honorary days, and established dietary restrictions, it also found that NGE lacked other accoutrements of religion and held that factor in equipoise. Ultimately, reasoning that there was no ultimate motivation behind NGE teachings other than a self-interested desire to better self and create a strong, unified black community, that NGE was primarily a social and cultural movement rather than a religion.

Conversely, in *Dettmer v. Landon*, the plaintiff prisoner was a member of the Church of Wicca. 799 F.2d 929, 931–32 (4th Cir. 1986). Wicca adherents practice, for lack of a better word, witchcraft. The district court found that Wicca adherents have a complex set of doctrines

relating to the spiritual aspect of their lives and a broad concern for improving the lives of others. The court of appeals affirmed, reasoning that Wicca adherents worship, conduct ceremonies, follow spiritual leaders, seek guidance from such leaders, and study doctrine. The court noted witchcraft's long history, dating to ancient pagan faiths. Because these beliefs were parallel to that filled by the orthodox belief in God in other religions, Wicca was a religion.

      *a.    Ultimate Ideas*

A "religion must consist of something more than a number of isolated, unconnected ideas." *Africa*, 662 F.2d at 1035. Religious beliefs usually seek to answer human kind's basic questions about life, purpose and death, and other deep and imponderable matters. *Meyers*, 95 F.3d at 1483. "These matters may include existential matters, such as man's sense of being; teleological matters, such as man's purpose in life; and cosmological matters, such as man's place in the universe." *Id.* Ideas about these imponderables address purpose relative the spiritual or intangible world, not merely a simplistic purpose confined to the physical world. *Quaintance*, 471 F. Supp. 2d at 1157. A "'monofaceted concern' with race is not a comprehensive system of beliefs about an ultimate concern." *Versatile*, 2011 WL 5119259 at *14.

Mr. Hale states that Creativity addresses man's purpose — "to perpetrate and advance our own kind," and, more specifically, "to propagate, advance and expand the White Race, to the highest pinnacle reached in the handiwork of Nature." He argues that man's "purpose" need not be spiritual, but can be natural. Mr. Hale asserts that "Nature has chosen our White Race to be the elite species of her realm" in the same way that the Jews were chosen by God "to be a people for Himself." He insists that Creativity addresses man's sense of being, which "is that of a racial being," and man's place in the universe; the "White man's place in the universe is that of the highest of all beings." In this vein, Mr. Hale contends that the whole Creativity religion is

concerned with the existence of the white race and addresses man's place in the universe. He asks if these are not existential matters, what matters are? Mr. Hale maintains that Creativity's beliefs are not secular because they themselves believe that such beliefs are sacred. He states that the evidence overwhelmingly shows that "there is far more to Creativity than the mere will to exalt one race over another," as purportedly characterized by the BOP, and instead characterizes exalting the white race over other races as "an extremely minute part" of his creed. Mr. Hale characterizes "Nature" as Creativity's deity notwithstanding what Mr. Klassen wrote in a letter once. Mr. Hale contends that no other religion deals more with questions of life and death, right and wrong, and good and evil; he says other religions leave individual conduct up to the individuals, but Creators "are constantly instructed that the guiding principle of all their actions shall be: what is best for the White Race?" He argues these beliefs reflect Creativity's obedience to its higher power. Mr. Hale takes umbrage at the BOP's characterization of Creativity as a violent movement, noting that Creativity is the only religion to forbid illegal conduct, though he immediately concedes it is not a full prohibition, as Creators are permitted to use violence in response to government force or assassination attempts by Jewish people.

Mr. Hale's belief that Creativity is a religion does not make it so; it simply establishes that he strongly believes in its precepts. Creativity beliefs arguably touch on life and purpose, as well as existential, teleological, and cosmological matters, but do so only in service of temporal objectives — to *further dominance of the white race*. By definition, dominance of the white race has only temporal meaning — it advocates a hierarchical social structure for human beings during their lifetimes. In that sense, its tenets are purely secular, political, and ideological as compared to spiritual. It is not concerned with the individual adherent's spiritual well-being, nor with any concept of afterlife, particularly for nonwhites. It is true that Creativity attributes its precepts to

13

Nature, but that is just a solipsistic justification for them. The mere existence of an external referent (Nature, God, Trump, Dr. Atkins) for particular beliefs does not, by itself, make such beliefs religious. Similarly, the borrowing of religious terminology such as "Commandments", "Golden Rule", "duty" and "holy" does not imbue a temporal objective with a spiritual quality.

Rather, lurking beneath the surface of Creativity's credos and commandments is the tacit understanding that, in prosecuting the Creativity worldview, whites will relegate nonwhites to bad lands at best and no lands at worst. # 186-29 at 35–36, Creed & Program No. 11. Contrary to Mr. Hale's assertion, the evidence overwhelmingly shows that there is little more to Creativity than its overbearing will to exalt white people over all others. By limiting itself to the basic questions of white people and a single idea to answer all such questions, Creativity makes it all too clear that it is not a religion, but instead a secular, "monofaceted" belief in white supremacy masquerading as a religion. *See Versatile*, 2011 WL 5119259 at *14. Like the NGE in Versatile, there is no ultimate motivation behind Creativity teachings other than a self-interested desire to establish white dominance. *Id*.

In sum, Creativity lacks an ultimate belief system that addresses philosophical and existential issues such as the nature of man, whether there is life after death, what role man plays in the universe, and the like. These beliefs address only the relative positions of people of different races during their lifetimes. Thus, the Court finds that Creativity fails to address ultimate ideas or metaphysical issues because it lacks any cosmological, teleological and existential focus. The ultimate-ideas factor therefore weighs against Creativity being a religion.

  b. *Metaphysical Beliefs*

Religions usually have some element of the metaphysical or supernatural permeating their belief systems, transcending the world, and data therein, immediately apparent to humans.

*Meyers*, 95 F.3d at 1483. "Adherents to many religions believe that there is another dimensions, place, mode, or temporality, and they often believe that these places are inhabited by spirits, souls, forces, deities, and other sorts of inchoate or intangible entities." *Id*. Creation science, for example, is metaphysical because it "depends upon a supernatural intervention which is not guided by natural law." *McLean v. Ark. Bd. of Educ.*, 529 F. Supp. 1255, 1267 (E.D. Ark. 1982).

Mr. Hale concedes that Creativity has no metaphysical aspects and, indeed, eschews them like secular humanism. # 193 at 50–51 (citing *Torasco v. Watkins*, 367 U.S. 488, 495 n.11 (1961)). He argues it is not necessary for a religion to be metaphysical. While Mr. Hale is correct that a metaphysical aspect is not required, it is important to note that his chosen exemplar, secular humanism, is not without its own controversy when it comes to being considered a religion. Indeed, the Ninth Circuit concluded that the Supreme Court in *Torasco* never held secular humanism was a religion and rejected a challenge on that basis. *See Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 521 (1994). And even though Creativity openly rejects anything metaphysical, it is still an important part of the *Meyers* analysis determining whether a new movement or belief system can be considered a religion under the Constitution. Thus, the metaphysical factor weighs against Creativity being a religion.

### c. Moral or Ethical System

Religions often prescribe an express way of living and interacting with other humans that could be described as a moral or ethical code, wherein thoughts and actions are considered on a largely binary spectrum in normative terms like good, evil, right, and wrong. *Meyers*, 95. F.3d at 1483. This moral or ethical belief structure may create duties to a higher power or spirit, the pursuit of which causes adherents to reject what would benefit their own elemental self-interest. *Id*. "The sort of ethical system contemplated by religion has a religious, as opposed to secular or

philosophical, connotation." *Versatile*, 2011 WL 5119259 at *15.

Mr. Hale notes that Creativity has a golden rule and 16 commandments that comprise a moral and ethical system.  # 193 at 53.  He argues that these precepts impose duties as *Meyers* contemplates and are the antithesis of seeking elemental self-interest because Creators are to do what is best for their race.  # 193 at 53–54.  Mr. Hale is "amazed" that the BOP would say that "self-interest is the very crux of Creativity," a "bizarre and idiotic statement."  # 193 at 54.  He argues that Creativity is every bit as moral and ethical as Christianity; it is just that the BOP does not like what Creativity stands for.  # 193 at 54–55.  Mr. Hale contends that Creativity is "all about" abnegating elemental self-interest because he chose a harder life fighting for his faith with Creativity than he would have had pursuing his musical career as a violinist.  # 193 at 55.  He asserts that Creators have a duty to sacrifice themselves for the good of their race.  # 193 at 56.  Mr. Hale says the BOP is wrong to characterize Creativity as unconcerned with neutral matters that do not benefit or harm white people, as "a benefit or harm to our kind can always be discovered."  # 193 at 56.  He notes that Creators "care about the welfare of the animal species of the world as their presence enriches our own lives" even though animals are a seemingly neutral moral or ethical case.  # 193 at 57.

Creativity does have a moral or ethical system, found mostly in its commandments.  These commandments take definitive positions on what constitutes good, evil, right, and wrong in Creativity's belief system.  However, the system is less of a system and more of a single, binary precept as the Court has already discussed.  Also at the same time, Creativity creates duties to itself, not to a higher power.  There is no religious connotation to Creativity's moral or ethical system; it is entirely based on the secular concern of white supremacy.  *See Versatile*, *Versatile*, 2011 WL 5119259 at *15.

No tenet of Creativity causes adherents to reject what would benefit their own elemental self-interest.   What Mr. Hale construes as the abandonment of his self-interest — choosing Creativity over the easier path of playing the violin — can indeed constitute the rejection of at least some of what would accrue to his personal benefit.   But he does not assert that this career choice was mandated by Creativity's tenets or even a call to ministry.   Rather, Creativity clearly mandates the furtherance of the white race at all costs, which is the embodiment of *elemental* self-interest.   *Elemental* self-interest concerns a human's primary, fundamental, baseline requirements and impulses, not a career choice.   Thousands of years of history have been rife with warring ethnic groups, characterized by people banding together and taking up arms with genetically similar people.   Finding and aligning oneself with ethnic brethren is perhaps the pursuit of self-interest at its *most* elemental.[5]   Accordingly, the moral-ethical factor weighs against Mr. Hale because Creativity's clear system of commandments is not religious in nature and Creativity clearly counsels pursuit of elemental self-interest.

### d. Comprehensive Beliefs

Many religions have ideas that are comprehensive in that they espouse an "overarching array of beliefs" that, in their totality, answer most the believer's problems and concerns regarding the human condition.   *Meyers*, 95 F.3d at 1483.   Most religious teachings consciously aim to elucidate "the nature both of world and man, the underlying sustaining force of the universe, and the way to unlimited happiness."   *Africa*, 662 F.2d at 1035.   "In other words, religious beliefs generally are not confined to one question or a single teaching."   *Meyers*, 95 F.3d at 1483.

Mr. Hale analogizes Creativity's golden rule to that of Christianity, arguing that

---

[5]   This pursuit of elemental self-interest is underscored by CREATIVITY's express disavowal of a higher power, duties to which typically cause religious adherents to move beyond acting in their basic self-interest.

Christianity is not confined to a single teaching like its golden rule, and so, too, Creativity goes beyond its golden rule.  # 193 at 44–45.  He maintains that Creativity offers an overarching array of beliefs on subjects such as organic farming, medicines, diet, vaccines, and fasting.  # 193 at 45–46.  According to Mr. Hale, the BOP fails to understand that Creativity is for white people but that does not mean its belief system is limited to the issue of race.  # 193 at 46.  Rather than a root principle in white supremacy, Mr. Hale says "Creators believe in the Eternal Laws of Nature as revealed through science, history, logic and common sense," which constitutes the first daily affirmation of Creativity.  # 193 at 47.  Mr. Hale argues Creativity is much more comprehensive than Christianity because there is no corresponding Christian diet, view of the environment, teaching on personal health, take on politics, take on economics, take on science, or take on medicines.  # 193 at 49.

As the Court has already noted, Creativity does not attempt to answer human kind's basic questions; it either avoids questions or to the extent it has an answer, that answer is reduced to the single-dimensional idea of white dominance.   Of Creativity's five fundamental beliefs, 16 commandments, and 20 creeds (41 total dogmatic points), nine are statements of fact about Creativity ("Your first loyalty belongs to the White Race"), three cover environmental purity ("we plan to put into operation a program of restoring the fertility of the soil"), and 27 can be boiled down to *all things in furtherance of the white race*.[6]   In putting forth Creativity's beliefs on diet, environment, personal health, politics, economics, science, and medicines, Mr. Hale misunderstands the array of beliefs *Meyers* seeks to articulate.   The inquiry is not searching for dogmatic views on this collection of issues; it seeks a cohesive belief system offering answers to

---

[6]  The 27 are: fundamental beliefs IV and V; commandments 1–5, 7–13, and 16; and creeds 1, 4–5, 7–12, and 18–20, all reproduced *supra*.

the suite of foundational questions about the human condition: *Who am I?*, *Why am I here?*, *Where do I come from?*, *How does life work?*, *What happens when I die?*, *What is my purpose?*, and *How should I act?*.   While it is true that some religions eventually arrive at *What should I eat?*, these foundational questions define a religion's worldview to the point that it may not even proceed to *Who should I vote for?*, as Mr. Hale notes of Christianity.   Indeed, Creativity does not answer any of these foundational questions unless they can be answered by *all things in furtherance of the white race*.   Creativity thus openly confines its theology to a single teaching just as the Republic focused on a single objective — to shrug off the government and live unfettered — in *Hutson*. 2018 WL 345316 at *4.

Creativity attempts to compensate for this dearth of comprehensive worldview by repetitive use of words that have a religious connotation.   For example, it touts itself as "the only salvation for the White Race."   # 186-10 at 2, Fundamental Belief V.   And though *salvation* has a real meaning (being saved from harm), it has a religious connotation that has nothing to do with Creativity's belief structure (deliverance from sin).   Along the same lines, Creativity's golden rule references "ultimate sin," # 186-10 at 2, Fundamental Belief IV, but this usage is untethered from religious *sin* (transgression against deity) and is instead generic (reprehensible action).   A sin against Creativity is a sin against its single-dimensional precept.   Creativity also refers to itself as a "faith."   # 186-19 at 12, Commandment No. 14.   Obviously, *faith* can be defined as a system of religious belief, but doing so as Creativity begs the question *faith in what?*.   Reference to the Christian and Jewish faiths is a derivation of these religions' adherents themselves placing their belief in a deity without proof of the deity's existence.   Creativity adherents place belief in nothing without proof, as the only thing they believe in is themselves and their collective power as a unit of white people — things not unseen.   *Faith*, therefore, along with *salvation* and *sin*, are

words that mean something different in Creativity than in the world's religions.

Creativity also attempts to compensate for dearth of comprehensiveness by proliferation of dogma. One of its three main religious texts is a how-to guide for natural living (*Salubrious Living*), loosely connected to the beliefs it espouses so stridently in *Nature's Eternal Religion* and *The White Man's Bible*. To borrow from Mr. Hale's analogy to Christianity, where Christianity provides a canvas upon which to paint a rich collection of views on the more mundane questions in human kind, Creativity offers a paint-by-number kit rigid in its dogmatic views on current events. Mr. Hale argues that Creativity is unrelated to the white-supremacist political party that Mr. Klassen created a few years before Creativity, but the conclusion is hard to escape in light of these views on current events. The creeds in Creativity's Creed and Program (to say nothing of the Articles for Defense of the White Race) read more like a political party's articles of belief or manifesto, or even plans of conquest, advocating for the expansion of white territory "similar to the historic 'Winning of the West'". # 186-29 at 35–36, Creed & Program No. 11. Creativity even has a battle cry — *RAHOWA!* — that stands for *racial holy war*. Thus, Creativity's overarching concern is with personal, social, and political questions. *See Conner*, 2009 WL 4642392 at *11. The comprehensiveness factor therefore weighs against Creativity being a religion.

>   *e.    Accoutrements of Religion*

Though a secular belief system does not become religious through the use of religious terminology and paraphernalia, many religions have external signs and elements that are indicative of a set of beliefs being religious:

>   a.    *Founder, Prophet, or Teacher*: Many religions have been wholly founded or significantly influenced by a deity, teacher, seer, or prophet who is considered to be divine, enlightened, gifted, or blessed.

b. *Important Writings*: Most religions embrace seminal, elemental, fundamental, or sacred writings. These writing often include creeds, tenets, precepts, parables, commandments, prayers, scriptures, catechisms, chants, rites, or mantras.

c. *Gathering Places*: Many religions designate particular structures or places as sacred, holy, or significant. These sites often serve as gathering places for believers. They include physical structures, such as churches, mosques, temples, pyramids, synagogues, or shrines; and natural places, such as springs, rivers, forests, plains, or mountains.

d. *Keepers of Knowledge*: Most religions have clergy, ministers, priests, reverends, monks, shamans, teachers, or sages. By virtue of their enlightenment, experience, education, or training, these people are keepers and purveyors of religious knowledge.

e. *Ceremonies and Rituals*: Most religions include some form of ceremony, ritual, liturgy, sacrament, or protocol. These acts, statements, and movements are prescribed by the religion and are imbued with transcendent significance.

f. *Structure or Organization*: Many religions have a congregation or group of believers who are led, supervised, or counseled by a hierarchy of teachers, clergy, sages, priests, etc.

g. *Holidays*: As is etymologically evident, many religions celebrate, observe, or mark "holy," sacred, or important days, weeks, or months.

h. *Diet or Fasting*: Religions often prescribe or prohibit the eating of certain foods and the drinking of certain liquids on particular days or during particular times.

i. *Appearance and Clothing*: Some religions prescribe the manner in which believers should maintain their physical appearance, and other religions prescribe the type of clothing that believers should wear.

j. *Propagation*: Most religious groups, thinking that they have something worthwhile or essential to offer non-believers, attempt to propagate their views and persuade others of their correctness. This is sometimes called "mission work," "witnessing," "converting," or proselytizing.

*Meyers*, 95 F.3d at 1483–84.

Mr. Hale argues that Creativity overwhelmingly demonstrates accoutrements of religion: a

founder considered to be a prophet; three important writings; gathering places in its churches around the world; ordained keepers of knowledge; ceremonies and rituals such as weddings, child pledgings, and confirmations of loyalty; a leadership structure with its greatest priest at the top, holidays such as Klassen Day, Founding Day, and Martyrs' Day; a diet and fasting as outlined in *Salubrious Living*; and a drive to convert people. #193 at 61–64. Mr. Hale notes that Creativity has no prescribed appearance or dress.

Creativity has a great many accoutrements of religion. Indeed, it appears to have gone to great lengths to establish as many accoutrements of religion as possible. Accordingly, the accoutrements factor weighs in favor of Creativity being a religion.

*f.   Conclusion*

To the minimal extent Creativity is religious, its beliefs are derived entirely from secular concerns. *See Quaintance*, 471 F. Supp. 2d at 1171. Therefore, synthesizing the *Meyers* factors as applied to Creativity, and viewing all factual disputes in the light most favorable to Mr. Hale, the Court finds that Creativity is not a religion for purposes of the Free Exercise Clause of the Constitution and RFRA.

### *3.   Justification for the Mail Restrictions*

Even if Creativity *was* a valid religion, the Court would nevertheless grant summary judgment to the BOP on Mr. Hale's RFRA claim (and, by extension, his free-exercise claim) on the grounds that the restrictions on Mr. Hale's correspondence were justified by a compelling governmental interest and were narrowly tailored to meet that interest. It is beyond dispute that the BOP's need to maintain security and order within BOP facilities is a compelling governmental interest, *Kikumura*, 242 F.3d at 962, and Mr. Hale concedes that the BOP also has a compelling interest in preventing its prisoners from using their correspondence to foment criminal activity

through associates in broader society outside of prison.   # 193 at 81–82 ("the Defendant has the right to prevent crime").

The BOP contends that the mail restrictions on Mr. Hale were necessary because of Mr. Hale's affiliation with Creativity, which the BOP has identified as a Security Threat Group (STG) since 1993.   Although the BOP does not prohibit inmates from affiliating themselves with STGs while in prison, it does prohibit them from holding leadership roles in an STG and from conducting STG business or providing guidance to the STG.

It is undisputed that, prior to his incarceration, Mr. Hale previously served as the ostensible worldwide leader of Creativity — the "Pontifex Maximus".   It is also undisputed that the BOP's reason for imposing the 2010 mail restriction on Mr. Hale was because he had designated himself as "Pontifex Maximus *Pro Tempore*"[7] in correspondence to other Creativity affiliates, appearing to again assume a leadership role.   The 2013 mail restriction was imposed for different reasons. In December 2012, Mr. Hale wrote to the leader of the National Socialist Movement, a Neo-Nazi organization, encouraging it to pursue "mass activism tactics" — namely, "street demonstrations, rallies in parks, and meetings in public libraries" —to "reach people who don't necessarily wish to be reached" with "the Holy Swastika."   The ADX Warden perceived Mr. Hale's correspondence to "bridge or merge" Creativity with the National Socialist Movement, and to "urge . . . a white supremacist group to pursue specific means to fight for their perceived common cause" with Creativity.

Both mail restrictions are supported by colorable interpretations of Mr. Hale's words and

---

[7]   Since Mr. Hale's incarceration, a schism has broken out over the true leadership of Creativity. Mr. Hale's 2010 correspondence was an attempt to (re)-install himself as temporary leader until an approved leader could be named.

actions.   In 2010, Mr. Hale was using his prison correspondence to attempt to reassert a leadership role for himself in a BOP-designated STG, an act for which a mail restriction is clearly an appropriate response.   The situation is slightly more ambiguous with regard to the 2013 correspondence, but the BOP's interpretation that Mr. Hale, long an influential figure in Creativity regardless of his leadership status, was attempting to guide or advise the National Socialist Movement is a reasonable reading of Mr. Hale's intentions.   Thus, the Court finds that the BOP has articulated a legitimate factual basis to believe that, in 2010 and 2013, Mr. Hale was using his correspondence privileges to further the leadership or guidance of Creativity, an STG.   This constitutes a compelling reason for the BOP to temporarily restrict Mr. Hale's ability to correspond with such groups.

Mr. Hale's response primarily attacks the BOP's characterization of Creativity as a STG in the first place.   He argues that, because Creativity is a religion — a point the Court concedes for purposes of this thread of the argument (but otherwise rejects for the reasons stated above) — "it would be unlawful for the Defendant to classify a religion as an STG and treat all of its adherents as a 'group' in a negative way accordingly."   Mr. Hale cites no authority for this proposition, and the Court finds it legally unsound.   Although the Constitution grants broad protections to religions and their adherents, in the prison context, even religious protections will yield to sufficiently important penological interests.   *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).   Thus, in a case like *In Re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 468 (4th Cir. 1999), the court affirmed the state's classification of an entire religious group as an STG, despite the inmates' argument that doing so infringed their rights under the Free Exercise Clause.   The court found that "there is ample evidence in the record supporting the reasonableness of [the state's] conclusion that the Five Percenters as a group posed

a threat to prison safety," pointing to members having been involved in three serious acts of violence in the state prison system over a four-month span, plus evidence that other jurisdictions had identified the group as racist, violent, and an organized threat to prison security.

Because there is no legal impediment to BOP identifying Creativity as a STG if the evidence otherwise warrants it, the Court turns to the question of whether the BOP has come forward with adequate evidentiary support to justify that determination. The Court notes several pertinent incidents that bear on the question:

- In 1999, apparently in response to the Illinois bar refusing to grant a law license to Mr. Hale, a Creativity adherent named Benjamin Smith when on a shooting rampage, targeting black, Asian, and Jewish victims, killing two and injuring nine before turning the gun on himself. Mr. Hale eulogized Mr. Smith, praising his willingness to "take action for his people . . . and spread our sacred message." Mr. Hale later gave an ambiguous statement on behalf of Creativity, refusing to condemn Mr. Smith's actions. Mr. Hale stated that "it's not he policy of the church to commit crimes, but [due to racial greivances] do not be surprised when a white man of the character and honor of Ben Smith stands up and fights back in the way that he did." Suggesting that "the future will see more, more Ben Smiths," Mr. Hale announced that "we cannot condemn a man for doing what he feels in his heart is right, whether it's outside the tactics of the church *or not*." *See United States v. Hale*, 448 F.3d 971, 975 (7th Cir. 2006)[8] (emphasis added).

- In 2000, when the Supreme Court refused to hear Mr. Hale's challenge to Illinois' denial of his law license, Mr. Hale left a message to Creativity followers, stating that he "can no longer in good faith and good conscience urge, recommend, or instruct my adherents and supporters in general to obey the laws of this land." He encouraged his followers to "take whatever actions we deem necessary to resist this tyranny" and stated that "whatever blood is spilled will be on the hands of those who so severely wronged us today." 448 F.3d at 976-77.

- In 2002, in retribution for a loss in a trademark lawsuit involving Creativity, Mr. Hale encouraged members of Creativity to take "any action of any kind" against the presiding judge and the attorneys for the opposing side (all of whom he had labeled "JEWS" or "TRAITOR WHITES"). A Creativity member specifically discussed with

---

[8] The cited reference is the decision by the Seventh Circuit Court of Appeals affirming Mr. Hale's criminal convictions, discussed below. The Court cites to this document both for purposes of convenience and because the facts therein have been deemed conclusively proven. The same facts are also supported by competent evidence in the record of this case.

Mr. Hale the idea of "exterminating the rat" – a reference to murdering the presiding judge – to which Mr. Hale responded "my position's always been that . . . I'm gonna fight within the law [but i]f you wish to do anything yourself, you can, you know?" In further discussions with the member, Mr. Hale repeatedly professed, on one hand, an intention to avoid involvement with the plan while simultaneously giving indirect advice and encouragement to the member to carry out the plan. Mr. Hale was ultimately charged with and convicted of soliciting a crime of violence against a federal officer and was sentenced to 480 months in prison, the sentence he is currently serving. 448 F.3d at 977–79.

- Creativity's written principles similarly intimate that violence in furtherance of Creativity's goals is sometimes acceptable. Article 7 of the Articles for Defense of the White Race, which is incorporated by reference into Creativity's statement of creed, states that "the crux of our position [is]: Should the [ ] government use force to violate our Constitutional rights to freely practice our religion . . . then we have every right to declare them as open criminals violating the Constitution and the highest law of the land. They then obviously are the criminals, and we can treat them like the criminal dogs they are and take the law into our own hands. . . . We must then meet the force with force and open warfare exists. It will then be open season on all Jews." Mr. Hale contends that this refers to a "doomsday scenario" that "ha[s] never been applied in the course of [Creativity's] 44 year history."

- Between 2005 and 2008, at least two individuals, William White and Hal Turner, were convicted of soliciting the murder of jurors and others connected with Mr. Hale's criminal trial. *United States v. White*, 698 F.3d 1005 (7th Cir. 2012); *United States v. Turner*, 720 F.3d 411 (2d Cir. 2013). It is important to acknowledge that there are no allegations that Mr. Hale knew of Mr. White or Mr. Turner, or that Mr. Hale was aware of or condoned their actions. Indeed, it is not entirely clear whether Mr. White or Mr. Turner were formally adherents of Creativity, or whether they simply shared similar political views. However, it is fair to recognize that both men's actions were directly inspired by Mr. Hale, his trial, and his prominent public image.

- According to the affidavit of Blake Davis, a former ADX Warden, in 2008, an inmate associated with Creativity used the occasion of Hitler's birthday to trigger a planned, racially-motivated riot at a BOP facility in Florence, Colorado.

- In 2016, Mr. Hale received an e-mail from a Creativity member who proposed to "take out any of the judges or prosecutors" from Mr. Hale's criminal trial, if Mr. Hale desired. Approximately one month later, Mr. Hale learned that one of the prosecutors from his criminal trial had been nominated as a federal judge. Mr. Hale issued a press release that, among other things, identified the judge as a "Jewish crypto-homosexual communist," accused him of "caus[ing] enormous grief to me, my family, and my church," and suggested that it is my hope that he will one day receive his comeuppance." Mr. Hale later amended the press release to substitute the phrase "legal comeuppance," and indicated that he intended to file a misconduct complaint

against the judge.

The Court acknowledges that Mr. Hale strenuously disputes the facts of, or the conclusions to be drawn from, the various events discussed above. He insists that the actions of Mr. Smith (and arguably, Mr. White and Mr. Turner) are the individual, unsanctioned acts of deranged individuals who disregard Creativity's directives to refrain from illegal conduct. Further, he suggests that these few rogue actors are "no different than what occurs with Christians, Muslims, Jews, and others on a daily basis." Mr. Hale insists that the provisions of Article 7 authorize resort to violence only in self-defense and that Creativity does not contend that such time is near. He has numerous disagreements with the circumstances that led to his own conviction, noting that there was no evidence that he did anything other than innocently advise the fellow Creativity member to do what he believed was right.

The Court finds that Mr. Hale's arguments and factual denials do not prevent the BOP from legitimately declaring Creativity to be an STG. As noted in *Five Percenters*, prison officials enjoy broad latitude in deciding how to effectuate its compelling interests of promoting safety both inside and outside of prisons. Here, as in that case, there is evidence that Creativity members have engaged in violent rhetoric, inducements to violence, and actual violent acts on multiple occasions. Mr. Hale professes that Creativity is inherently a peaceful and law-abiding religion, but there is adequate evidence to suggest that those principles are frequently disregarded by its members, including Mr. Hale himself. Although Mr. Hale strenuously protests his innocence, he himself has been convicted of soliciting the murder of a federal judge and, unless and until that conviction is vacated, the Court must accept Mr. Hale's guilt on that offense as having been conclusively proven. Mr. Hale's suggestion that Creativity may be beset by a handful of bad actors who commit crimes, just as Christian and Muslim adherents commit crimes without

tarnishing the reputations of other adherents, fails for that same reason: even if the actions of those Creativity adherents listed above would not justify mail restrictions imposed on an ordinary Creativity member in the BOP, they *do* justify restrictions imposed on Mr. Hale himself, as Mr. Hale has used his leadership in Creativity to inspire and induce others to violence. Accordingly, the Court is satisfied that, even if Creativity were treated as a religion, the BOP has shown that it had a compelling justification for the mail restrictions imposed on Mr. Hale in 2010 and 2013.

The BOP has further shown that the mail restrictions were the least restrictive means that the BOP had to advance its compelling interest in protecting society from harm at the hands of Creativity adherents who might be induced by Mr. Hale. Mr. Davis, the ADX Warden who imposed the 2010 restriction, explained that between August 2009 (prior to which Mr. Hale was again on a mail restriction) and June 2010, the BOP "attempted to manage [Mr. Hale's] communications on a letter-by-letter basis," but found that such individualized review of Mr. Hale's correspondence was insufficient to prevent inappropriate communication with Creativity followers. As Mr. Davis explains, the BOP eventually learned that "it was clear from [Mr. Hale's] correspondence that he *wanted* to exert the influence that being Pontifex Maximus gave him." Thus, Mr. Davis' explanation reveals that something less than a full ban on correspondence with Creativity adherents was insufficient to prevent Mr. Hale from attempting to exert leadership or control over Creativity. In such circumstances, the BOP has carried its burden of showing that no less-restrictive alternative to the mail restrictions would have sufficed to achieve its compelling interest.

Accordingly, the Court finds that there is no genuine dispute of material fact requiring trial. Mr. Hale's free-exercise and RFRA claims fail because: (1) the Court finds that Creativity does not constitute a religion, and (2) to the extent it does, the BOP has carried its burden of showing that

the 2010 and 2013 mail restrictions were justified by a compelling governmental interest that was narrowly-tailored.

**B.     First Amendment Retaliation**

Mr. Hale alleges that the 2010 and 2013 mail restrictions were also imposed against him as retaliation for his exercise of his First Amendment rights to correspond with other adherents of Creativity.   To establish a claim for retaliation for the exercise of First Amendment rights, Mr. Hale must show: (1) that he engaged in a Constitutionally-protected activity, (2) that the BOP subjected him to an action that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) that the adverse action was substantially motivated by the constitutionally-protected conduct.   *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007). It is essentially undisputed that Mr. Hale can establish each of these elements: he clearly engaged in First Amendment activity by corresponding peacefully with Creativity members and the National Socialist Movement.   The BOP does not materially dispute that the 2010 and 2013 mail restrictions are adverse actions that might chill the First Amendment inclinations of persons of ordinary firmness.   And it is undisputed that the mail restrictions were specifically imposed *because of* the contents of Mr. Hale's correspondence.

However, even if Mr. Hale establishes retaliation, the BOP remains authorized to engage in such retaliation if it is reasonably related to legitimate penological interests under *Turner*.   *See Allmon v. Wiley*, 483 F. App'x 430, 432 (10th Cir. 2012); *Frazier v. Dubois*, 922 F.2d 560, 562 (10th Cir. 1990).   The Court need not conduct the full *Turner* analysis, as the discussion above establishes that the BOP had a compelling justification for imposing the mail restrictions when Mr. Hale began engaging in correspondence that concerned exercising control or guidance over a validly-designated STG.   Thus, even if the BOP's impositions of mail restrictions were retaliation

for Mr. Hale's exercise of his First Amendment rights, those restrictions were justified by legitimate penological interests and thus, the BOP is entitled to summary judgment on Mr. Hale's retaliation claim.

## B. Diet Claims

Mr. Hale alleges that the BOP has violated his free-exercise rights and RFRA by refusing to provide him with the diet encouraged by Creativity, which is essentially a diet consisting solely of raw and unprocessed foods (including no canned foods). Once again, consideration of these claims is governed by the more restrictive RFRA analysis that requires Mr. Hale to make a preliminary showing that not be provided his requested diet constitutes a substantial burden on a religious exercise, at which point the burden shifts to the BOP to show that the restriction is justified by a compelling governmental interest and is narrowly-tailored.

Mr. Hale's first difficulty with these claims is that, for the reasons stated above, the Court has found that Creativity does not constitute a religion; as such, its demands that adherents consume a raw-food diet is not a religious observance protected by the First Amendment or RFRA.[9]

---

[9]   If the Court were to conclude that Creativity is religious in nature, the Court would likely allow Mr. Hale's RFRA diet claim to proceed to trial. The BOP has offered a bewildering array of justifications for refusing to provide Mr. Hale a raw-food diet, including concerns about kitchen efficiency, cost, pilferage of food by kitchen staff, hoarding by Mr. Hale, fermentation of fruits into alcohol, security concerns relating to the passing of note or poisoning of identifiable food trays, the fear that fellow inmates will become jealous of Mr. Hale's diet and join Creativity for the same benefit, and many others. The few courts that have considered some of these concerns have generally found them to not be sufficiently compelling. *See Koger v. Bryan*, 523 F.3d 789, 800 (7th Cir. 2008) (questioning whether "orderly administration of a prison dietary system" and concerns of efficiency are sufficiently compelling); *United States v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1341, 1346–47 (11th Cir. 2016) (rejecting cost containment and inmate jealousy as compelling reasons). *But see Vega v. Lantz*, No. 3:04-CV-1215, 2009 WL 3157586 (D. Conn. Sept. 25, 2009) (finding inmate jealousy and cost containment to be compelling justifications).

## C.    Denial of Literature

Mr. Hale claims that his free-exercise rights were violated by the BOP's prohibition against him having a copy of *Nature's Eternal Religion*, Creativity's "Bible," in his cell.    It is undisputed that the BOP has relented on this point, and that Mr. Hale is allowed to possess a copy of the book so long as he is housed at ADX.    The BOP argues that, therefore, this claim is moot; Mr. Hale argues that the claim is not moot because, without a ruling on the merits, the BOP could take the book away at any point in the future without consequence.

As courts of limited jurisdiction, federal courts are constitutionally required to decide only actual cases or controversies.    *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013).    The existence of a case or controversy is predicated on the existence of a live case that is not moot. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010).    A live suit can become moot when the plaintiff "no longer suffers actual injury that can be redressed by a favorable judicial decision."    *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015).

The BOP represents that so long as Mr. Hale is incarcerated at ADX,[10] he is free to have his literature in his cell.    The Court has no reason to question the sincerity of this representation, and indeed, to some extent, the Court's adoption of that representation in this Order would likely prevent the BOP from taking the position in the future that *Nature's Eternal Religion* could be declared contraband at ADX.    Mr. Hale offers nothing more than speculation that the BOP might change its mind later.    In such circumstances, the Court is satisfied that Mr. Hale's claim seeking

---

[10]    Mr. Hale does not offer any argument about the effect that a transfer to another, less-restrictive prison would have on his right to possess the book, and thus, the Court does not entertain that possibility.

a copy of *Nature's Eternal Religion* is moot.

In any event, were the Court to reach the merits, it would find that the BOP has the authority to restrict Mr. Hale's possession of the book outside of the highly-restrictive context of ADX. An inmate's entitlement to possess a given publication is evaluated under the *Turner* standard, which examines: (1) the existence of a rational connection between the prohibition and the governmental interest justifying it; (2) whether there are alternative means of exercising the right claimed by the inmate; (3) the effect that accommodation would have on prison staff and other inmates; and (4) whether obvious, easy alternatives to the prohibition exist at *de minimis* cost. *Jones v. Salt Lake Cty.*, 503 F.3d 1147, 1153 (10th Cir. 2007). As the BOP notes, *Nature's Eternal Religion* contains extensive racially-inflammatory language and ideas, the dissemination of which in a multi-racial prison environment is highly likely to lead to violent conflict among inmates. It is no surprise that numerous courts reaching this exact question have found it permissible for prisons to ban the possession of *Nature's Eternal Religion* and other Creativity texts under *Turner*. *Birkes*, 2011 WL 5117859 at *6 (*citing Byrnes v. Biser*, No. 06-249, 2007 WL 3120296 at *1–2 (W.D. Pa. Oct. 23, 2007)). Thus, to the extent that the Court were to conclude that Mr. Hale's claim is not moot, the Court would find that it is within the discretion of the BOP to prevent him from possessing *Nature's Eternal Religion* or other Creativity texts outside the context of ADX.

## D. Remaining Motions

Mr. Hale moves to strike a "fact exhibit" included with the BOP's reply brief (**# 199-1**). Because the Court did not consider the exhibit, the motion is denied as moot. Mr. Hale also moves to submit declarations from nonparties in support of his summary-judgment response. Mr. Hale had an opportunity in preparing his response to submit any and all evidence he wished. As a

lawyer, Mr. Hale was familiar with what evidentiary exhibits he could have attached. The Court therefore finds his request untimely, but even if it were timely, the Court is satisfied that Creativity's texts and Mr. Hale's arguments thereon create a sufficient evidentiary record.

Though not styled as motions, Mr. Hale continues to submit filings that allege the BOP has again imposed mail restrictions at various points since this lawsuit was filed. The Prison Litigation Reform Act requires prisoners to exhaust administrative remedies for claims brought under federal law with respect to prison conditions. 42 U.S.C. § 1997e(a). Consequently, Mr. Hale may not freely add an unexhausted mail restriction to his exhausted claims. In any event, Mr. Hale has not even invoked the proper procedure to amend his complaint to add allegations that arose after filing suit. *See* Fed. R. Civ. P. 15(d) (describing supplemental pleadings). The Court therefore did not consider any mail restrictions outside July 2010 to January 2011 and January to August 2013. As a result, the BOP's motion to strike these filings is denied as moot.

## V. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (**# 186**) is **GRANTED**. The Plaintiff's Motion to Strike (**# 202**) is **DENIED AS MOOT**, the Plaintiff's Motion to Allow Declarations by Nonparties (**# 206**) is **DENIED**, and the Defendant's Motion to Strike (**# 210**) is **DENIED AS MOOT**. Judgment shall issue in favor of the Defendant.

Dated this   28th   day of March, 2018.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge